## BELL & CO. *v.* THOMAS.

Where a subsequent mortgagee has actual notice of a prior existing mortgage on the same premises, it is immaterial which was first recorded.

And where two mortgages on the same premises, were executed on the same day, one of which was filed for record, as appeared from the certificate on the mortgage, half an hour before the other; and where it appeared from the testimony of the mortgagor and others, that the mortgage last recorded, was first executed, and that the second mortgagee had actual notice of the execution of the first mortgage; *Held*, That the first mortgagee had a priority of lien.

### *Appeal from the Alamakee District Court.*

THE petition in this case states, in substance, that on the 11th of February, 1853, James Peacock made his note to plaintiff for $555, due in twelve months, with fifteen per cent. interest, and executed and delivered to plaintiff at the same time, a mortgage of lot No. 5, in block No. 4, section No. 1, in the village of Lansing, to secure the same; that on the same day, Peacock being indebted to the defendant, executed a mortgage of the same property, and delivered the same to defendant, to secure said indebtedness; that the defendant received the same with notice of the plaintiff's mortgage; that it was agreed between Peacock, plaintiff, and defendant, that plaintiff's mortgage should have priority, and that defendant should take his mortgage subject to plaintiff's; that on the

same day said mortgages were delivered to the recorder of deeds of Alamakee county, at the same time, to wit, at half-past twelve o'clock in the afternoon, to be recorded; that the said mortgage to defendant was placed first on the record; that defendant has ordered a foreclosure of his mortgage by the sheriff of said county, and inasmuch as both said mortgages were filed for record at the same time, the purchaser under the sale about to be made on the defendant's mortgage, cannot by the records alone have such notice of the priority of the said mortgage of plaintiff, as will bind him; and that unless the sheriff is restricted by an order of court, there is danger that he will pay to the defendant the amount of his lien, out of the proceeds of the sale of said land, without first supplying plaintiff's mortgage. A copy of the note and mortgage, are annexed and made part of the petition, and petitioner asks that his mortgage may be declared a lien prior to defendant's, and that the sheriff be ordered to pay off plaintiff's mortgage before paying over any money to defendant, and for general relief.

The defendant answers, admitting the execution of the note to petitioner; the execution and delivery to him of the mortgage; and the execution of the mortgage to defendant; but denies that the mortgage to plaintiff was first executed, acknowledged, and delivered; or before the mortgage to defendant was executed, acknowledged, and delivered; that defendant's mortgage was received, with notice of plaintiff's; that it was agreed between Peacock, plaintiff, and defendant, that the mortgage to plaintiff was to have priority; that plaintiff's mortgage was delivered to the recorder of deeds, to be recorded before defendant's; avers, that defendant's was delivered first for record, and was recorded first; that plaintiff knew that Peacock was indebted to defendant, and that at the time of his taking his said mortgage, knew that defendant was seeking to secure his said demand; and prays that the priority of the defendant's lien be confirmed, and for general relief. The petitioner replies, reaffirming the allegations in his petition, and denying that defendant's mortgage was delivered first for record.

The evidence consists of the deposition of Peacock, the mortgagor; a statement of one Camp, the attorney, who drew the mortgages, and the affidavit of one Conkey, who was acting as recorder, at the time the mortgages were filed for record, and the mortgages, which are made exhibits in the case. Peacock testifies, that John Coats took the mortgage on behalf of plaintiff; that he did not on the same day execute the mortgage to defendant, but did the day following; that a Mr. Work took the mortgage for defendant; that Work told witness that Coats was going to get his mortgage recorded first, and that it was so agreed between them; that while all three were present, Coats told Work, that he had a right, being he came the day before, to have his done and fixed right; Coats agreed to take the storehouse and lot, and Work the other two lots; they agreed on that, and fixed it; Coats told him he did not wish to have any racing done about the recording; they agreed to go together to the recorder's office, and Coats was to get his mortgage recorded first. When witness and Work were together, Work told witness that it was agreed between him and Coats, for plaintiff, that Coats should have his mortgage recorded first. The way it happened that Work got the same property into his mortgage, that Coats had in his, was by force, against my consent. The original agreement between Work and myself was, that he was simply to have the lots. When all three were present, Work said he would let John (Coats) have his recorded first; he did not wish to have any fuss; he came up there and wanted to have all done right. Witness owed plaintiff for goods bought of plaintiff at the time the mortgage was given. The statement of Camp, which was received as testimony by agreement, is in substance, that some time in the winter of 1852–'3, John Coats, of Dubuque, and one of the firm of John Bell & Co., came into my office, in company with James Peacock, of Lansing. Mr. Peacock stated that he wanted to give Mr. Coats a mortgage in favor of John Bell & Co., to secure a debt which the said Peacock owed the said Bell & Co. Coats said, if I would give him a blank mortgage, he would

fill it out. I gave him a blank. And on the same, or the next day, Mr. Coats again came into the office, in company with one Mr. Work, of Dubuque, and I think (though I am not certain), Mr. Peacock. Mr. Coats then asked me to draw a mortgage in favor of John Bell & Co. I drew the mortgage, and Mr. Coats took it and left the office; Mr. Work then asked me to draw a like mortgage in favor of J. B. Thomas, and upon the same property. I proceeded to draw the mortgage (after or during the time I was drawing it), informing Mr. Work that he must take the mortgage, subject to the prior mortgage of Bell & Co. I do not recollect that he made any reply, but think he answered that he was aware of it, and took the mortgage and left the office. Said Camp further states, that he was present when Coats and Peacock were holding a conversation in regard to securing the claim of Bell & Co., and Mr. Peacock said he would give Bell & Co. a mortgage on his place in Lansing, and directed me to draw the mortgage. At this time Mr. Thomas's claim had not been mentioned, and I think Mr. Work was not in Lansing; if so, I had not seen him. The mortgages were taken from my office, without acknowledgment. I was not present at the time they were acknowledged. The testimony of O. S. Conkey, in an affidavit which was read in evidence, by consent, is as follows: That on the 11th day of February, 1853, while he was acting as recorder of deeds, of Alamakee county, two persons came to the recorder's office, and handed him each a mortgage to file for record. One was a mortgage from James Peacock to John Bell & Co., and the other from James Peacock to J. B. Thomas; and affiant understood from the persons, that both mortgages covered in part the same property. It was agreed by these persons, while there in affiant's presence, that one of said mortgages should be recorded before the other; that the mortgage to be recorded first, should be marked filed at twelve o'clock, and the other mortgage should be marked filed at half-past twelve o'clock; affiant thereupon picked up one mortgage, and marked it, filed at twelve o'clock; and thereupon picked up the other, and marked it, filed at half·

past twelve o'clock. It was then observed by the persons, that affiant had made a mistake, and marked the mortgages in regard to filing wrong; and affiant thereupon in the presence of the parties, and by their consent, proceeded to erase and alter the time as marked on said mortgages, and that is the way the erasures came to appear upon the mortgages. The mortgage marked filed at twelve o'clock, was to be recorded first, as agreed between said parties. The exhibits appended to the bill and answer, show that plaintiffs' mortgage was filed at half-past twelve o'clock, on the 11th day of February, 1853, and that of defendant at twelve. Both mortgages bear date, February 11th, 1853, and appear to have been acknowledged and filed for record on the same day. The note to plaintiff bears the same date. Under this state of pleadings and facts, the bill was dismissed by the District Court, from which plaintiff appeals.

*Smith, McKinlay & Poor*, for the appellants, filed the following brief:

This cause presents in fact but one point, and that is, whether J. B. Thomas took his mortgage from James Peacock, with notice of the existence of a prior mortgage to John Bell & Co. For proof that defendant had such notice, the plaintiff refers to the testimony of Camp and Peacock.

For the law governing the case, the plaintiff refers to the Code, § 1211. Also, to the case of *Dunham* v. *Day*, 15 Johns. 567, where the court hold the following language: "By a *bona fide* purchaser, I understand the statute to mean a person who buys without knowledge of the prior mortgage, and who would in fact be defrauded, if such prior incumbrance were to stand in opposition to his title. The manifest object of the statute was, to protect purchasers against prior secret conveyances of which such subsequent purchasers had no notice." "Notice supercedes registry, because it effects the same object, which is to apprise the purchaser of the prior incumbrances." See, also, the case of *Le Neve* v. *Le Neve*, 3 Atkins, 646, where the court (Lord

Hardwick) said it would be a most mischievous thing, if a person taking the advantage of the legal form appointed by an·act of Parliament, might under that, protect himself against a person who had a prior equity, of which he had notice.   2 Leading Cases in Equity, 97; Notes to case of *Le Neve* v. *Le Neve; Jackson* v. *Neely*, 10 Johns. 374.   In the case of *Jackson* v. *Valkenburg*, 8 Cowen, 260, the court say, that when a mortgage is given, the mortgagee being expressly informed of the existence of a previous mortgage, and understanding that he is to take his mortgage subject to the previous one, he is affected by this notice, though the previous mortgage be not registered.   2 Hilliard on Mortgages, 253; *Jackson* v. *Leek*, 19 Wend. 339; *Jackson* v. *Sharp*, 9 Johns. 163; *Porter* v. *Cole*, 4 Maine, 20 ; *Farnsworth* v. *Childs*, 4 Mass. 637; *Correy* v. *Caxton*, 4 Binney, 140; *Solms* v. *M'Culloch*, 5 Penn. 472 ; *Van Meter* v. *McFaddin*, 8 B. Monroe, 442 ; 8 Alabama, 866; 9 S. & M. 34; 4 Scam. 117; 16 Alab. 28.

*Wm. Vandever*, for the appellee, after reviewing the testimony, argued:

We come now to consider the claim for priority, which is based upon notice.   Here are two creditors seeking to secure their respective debts.   Each is aware that the other is seeking to secure himself; one by his superior diligence, acquires a priority of right, and upon the debt falling due, he proceeds to collect by foreclosure of the mortgaged premises; the other, then, whose debt is not due for many months to come, steps in and endeavors to disarm him by the aid of this court.   Will this court thus step in at the bidding of plaintiff, and decree preferences among creditors.   There is no fraud on our part.   Neither party stands upon the ground of a purchaser for valuable consideration, so as to be affected by notice.   The consideration in each mortgage is an antecedent debt, contracted long before notice, and the doctrine of "*qui prior est tempore potior est*," must prevail.   *Warden* v. *Adams*, 15 Mass. 233 ; 2 Pow. on Mortgages, 631 and note ; *Muse* v. *Litterman*, 13 Serg. & Rawle, 167; 1 Dev.

Eq. 470; 2 W. & T. Eq. Cas. 110; *Cushing* v. *Hurd*, 4 Pick. 255; 2 Lead. Cases in Eq. 77.

If the doctrine as contended for by appellant, in his argument, is to be applied as between creditors seeking to secure their debts; if, in fact, for one man to proceed to secure his debt against an insolvent, whom he knows to be indebted to others, by taking a mortgage, is a fraud upon other creditors, then indeed, by the same reasoning, it would have been fraudulent for us, to have proceeded by attachment against Peacock, without first having got the consent of Bell. This, in effect, is the doctrine contended for on the other side. It is a maxim, that where equities are equal, the first in time, must prevail. The circumstances of this case, disclose the fact beyond controversy, that our equity is at least equal to theirs; and beyond controversy, we are first in time. Our debt matured first, and our mortgage had priority of registry. We are first, then, in right. 4 Kent Com. 173; 10 Peters, 210. What, in fact, is the relief which appellant seeks in this case? Our right is certainly, in equity, as good as his, yet he says by his argument, that it is a fraud upon him, for the court to allow us take the advantage of our superior diligence; and what relief does he ask from this court, not that the mortgages shall be declared simultaneous, but that he shall be allowed to commit a fraud upon us, by taking away our rights. This we are satisfied the court cannot permit.

The plaintiff nowhere alleges in his bill, that he is remediless at law. It may be that Peacock has abundant other means from which Bell & Co. could satisfy their claim. There is nothing to prevent Bell & Co. from having sued upon these notes, and recovered judgment and ultimate satisfaction of their debt. They ask the court to allow them to take the benefit of our diligence, and when we have collected the money, the prayer of their petition is, that we be required to pay them their debt. In fact, they would stand with folded arms, and take the benefit of our diligence. There is no equity in their bill, and we respectfully submit that the court below did not err in dismissing it.

ISBELL, J.—Before entering upon the consideration of the issues raised by the pleadings in this case, we wish to remark in relation to the testimony of the witness Conkey, with regard to an agreement as to which of these mortgages were to be first filed for record, that we are not at liberty to view the evidence of this agreement, in the light in which defendant insists that it must be viewed. We can consider this agreement, only as a circumstance tending to show that defendant's mortgage was first executed, and not as a valid agreement, whereby the priority of plaintiff's lien may be affected, provided that defendant's mortgage was subsequently executed, with notice to him of plaintiff's prior lien. The reason of this is, that defendant has not by his answer, tendered any such issue as that, although plaintiff's mortgage was first executed, yet it was agreed between the parties, that defendant's should have priority of lien. Had such issue been tendered to plaintiff, he might perhaps have been ready with proof to meet it. Not being tendered, it was not incumbent upon him to be so. The issues made by the pleadings, are those only which the court can determine. Had such an issue been made, the evidence of Conkey should be viewed in a different light than it can now be viewed. We think the legitimate questions that arise from the pleadings are, has the plaintiff shown by the evidence, that his mortgage was first executed, and that defendant took his mortgage with notice of plaintiff's lien?

However the rights of *bona fide* purchasers might be affected, on account of the defendant's mortgage being first recorded, as between the immediate parties, we cannot regard it very material in a court of equity which was first recorded, provided the party procuring his to be first recorded, had actual notice of the existence of the mortgage of the other party, at the time of procuring his, and causing it to be recorded. The mortgage of defendant, bearing the same date with that of plaintiff, and bearing filing for record a half hour previous to that of plaintiff, in the absence of other proof, raises the presumption that defendant's was first exe-

cuted. To overcome this presumption, the burden of proof rests with the plaintiff.

Has he shown that his mortgage was, in point of fact, first executed? We can arrive at no other conclusion than that he has. The mortgagor distinctly swears to this, and the statement of Camp, which is received in evidence by agreement, shows that defendant's mortgage was subsequently drawn; and the inference is quite irresistible, from this statement, that it was drawn while plaintiff was procuring his to be executed. The answer, not being upon oath, the testimony of these witnesses leaves the fact almost unquestionably proved. With regard to the fact, as to whether the defendant had notice of the execution of plaintiff's mortgage, at the time of the execution of defendant's, we think the evidence is quite conclusive.

These facts existing, plaintiff had unquestionably a priority of lien. Having proved them to exist, the presumption arising from the date of filing for record, was overcome, and a *prima facie* case made out for plaintiff. To overcome this, it was competent for the defendant, in his answer, if it were the fact, that plaintiff had divested himself of this right of priority by agreement, to have confessed notice, and avoided, by setting up the agreement. He did not choose to do so, and we are to try the issues joined by the parties. It would be fully as proper, if we so believed from the evidence, which we are strongly inclined to believe, and which reconciles all the evidence in the case, to hold that a mistake was made in giving directions to the recorder, the plaintiff not having set up a claim of this kind in his bill, as to hold that plaintiff's priority of lien, had been divested by an agreement, the defendant not having set up this claim in his answer. We conclude, therefore, that the equity of the case is with the complainant. The decree of the District Court will be reversed, and a decree entered in this court in accordance with the prayer of the petition.